Robert Medina
Reg. No. 68297-054

--------------------------------

--------------------------------

--------------------------------

April 27, 2020



Honorable Judge Paul G. Gardephe
United States District Court
Southern District of New York
500 Pearl Street
New York, NY  10007

                                    Re: Medina v. United States
                                        18 Civ. 734 (PGG)(RWL)
                                        13 Cr.  272 (PGG)

Dear Honorable Judge Gardephe:

    Enclosed is a copy of my official Motion to file a 3582 for "Compassionate Release for Compelling and Extraordinary Circumstance." I respectfully request that you take this serious matter into your consideration as I feel strongly it could be a matter of life and death.


Your most humble servant I remain,

*Robert Medina*

Robert Medina
#68297-054
Federal Correctional Institution-Ashland
P.O. Box 6001
Ashland, KY  41105


Enclosure

1

Dear Honorable Judge Gardephe

I would like this letter to serve as a Motion to file a 3582, requesting "Compassionate Release" as provided in the First Step Act, for Compelling and extroardinary circumstances," which is the current Pandemic Covid-19 virus. I have a disclaimer attached which shows I sought all remedies with the BOP. The Covid-19 as the writing of this letter has infected nearly 1,000 inmates and guards in the BOP. There have been thus far 22 deaths inside the BOP.

I strongly feel that the BOP is not equipped nor prepared to safely deal with this pending pandemic. There are no bleach sanitizers, no alcohol based 60% hand sanitizer stations nor any sold on Commissary as highly recommended by the CDC. We have small 3' walkways, and live in very cramped quarters of 8X8' cubicles which prevents spacing mitigation recommendations of the CDC as well. We have "communal type living quarters in my JA Unit which houses 80 inmates in the "barns." So called because the small 160' X 40' housing unit used to an actual animal barn, and is thought to be 100 years old, renovated into living quarters. Black mold is prevalent everywhere, and asbestos fills the ceilings here, the paint inside our walls are "lead" paint. We are separated by a 4' cinder block wall between units, while many men sleep head to head being no more than 6-12 inches apart. We have communal dining where are meals are delivered to us three times a day while we eat in our cells/unit cubicles.

In early April of this year, the U.S.S. Aircraft Carrier Theodore S. Roosevelt reported that it had some serious cases of the Covid-19 virus on board the ship. On the initial request for docking to the U.S. Naval Command 37 sailors were infected. The next day on a Thursday the number of infections had grown rapidly to 71, the next day (Friday) the Covid-19 Virus infections had reached 93. By the time the ship docked in Guam on Saturday, it had 230 infected soldiers. The Captain of the ship reported circumstances very similar to what we experience everyday here in our JA Unit. As of the writing of this letter, today April 24th, over 800 men are now infected with the Coronavirus.

Many CDC experts, doctors, local, state, and federal officials admit that the current prisons and jails, which have restrictions on possession of alcohol based cleaning solutions and hand sanitizers (which the ship Theordore Roosevelt had plenty of ), coupled with prohibition to utilize bleach for disinfectant purposes or sprayed for sanitation purposes, create an atmosphere for the inmates that is nothing more than a "petri-dish" for spreading the Covid-19 virus very rapidly. The Chief Doctor, Ross MacDonald of Rikers Island on April 1st, sent an unsettling warning to law enforcement saying that it is unlikely that even "herculean" efforts by health professionals inside the jail can quell the rapid spread of the novel Coronavirus within its walls. Rikers, like many, if not all prisons is a public health disaster unfolding before our very own eyes, he wrote. On Twitter, thedoctor urged the city of New York's District Attorney to support the continued release of vulnerable inmates. A smaller inmate population-especially those senior citizens age 55 and older has been most impacted with the outbreak of the virus. The deaths due to the Covid-19 outbreak have severely impacted those 60 and over with 70 to 80% of the deaths recorded by the CDC.

2

Of those who have died, the CDC has underlying research which shows the five critical underlying health issues which are the following:
1) obesity
2) hypertension & heart related health issues
3) asthma & lung ailments
4) diabetes
5) immune deficiency health issues

These statistics have been readily apparent in all of the deaths from the coronavirus. Another unsettling statistic is that black males have been the most infected here in America. Here in the BOP conditions are very similar to what was experienced on the Theodore Roosevelt ship with small passageways, no mitigation of spacing and being unable to distance from one another due to the cramped quarters, communal dining, and many men crowded into a small space, identical to the BOP. The cruise industry has experienced similar problems with the spread of the virus as well and not being able to contain it.

Another critical problem with the BOP is the critical shortage of wide spread testing at the 122 Federal Prisons, which is almost non-existent due to nothaving tests available. Couple this with the continued transfer of new inmates between institutions, introductions of newly hired staff members, the introduction of new inmates who are arrested, or, whom self surrender, plus the thousands of staff members and contractors that go in and out of these institutions daily, all of which makes for an ideal situation for spreading the virus to the inmates who are locked away in their cells/cubicles. In Ashland alone it was common knowledge that only 15 Covid-19 test kits were available. Including Camp Ashland along with the Ashland FCI where I am located, we have aproximately 1300-1400 inmates.

Test kits in neighboring states BOP facilities are no better! Take nearby Terre Haute, Indiana, via "Mother JOnes Magazine"via Steve Markle, National Union Leader stated that only "four" tests were available. At FCI Oakdale, correctional officers were literally told to "quit testing people (prisoners)" and just assume that they were sick and infected with the virus, via President of the Local Union Ronald Morris.

There is widespread rumor as well that the BOP is "under-reporting" the amount of infections of inmates with the coronavirus as was evidenced last Friday wherethe BOP initially reported 50 sick with the virus. But once in Federal Court (under oath) the BOP admitted thatit had 207 suspected cases of inmates with the Covid-19 virus.

FCI Elkton in neighboring Ohio currently reported that they only received 80 test kits, used 37, and had 43 more on hand and was hopeful that they would receive 25 more this week.

N.W. Democrat Gazette released emails last Monday in which Arkansas health officials wondered whether the BOP fully understood the actual "sericusness" of the coronavirus outbreak at FCI Forrest City, and whether the BOP was fully cooperating with mitigation efforts that were promoted by the CDC. On April 3rd, the Arkansas Dept. of Health Director of Infectious Disease questioned the prison efforts and expressed a desire for DCD back-up.

Currently it is believed that BOP has released fewer than 1000 inmates of the approximately 177,000 that exist currently in the BOP since the passage of the CARES ACT, which was done to release vulnerable prisoners in a non obtainable mitigation environment, making inmates very vulnerable to the Covid-19 Pandemic Virus. There has been much pushback and controversies between the DOJ and BOP and The Attorney General Bill Barr's offices as to the launguage interpretation of the law set forth by Congress. In the beginning the 50% of time served by inmates was not a factor as men were identified who met the criteria to be immediately quarantined as stipulated by Congress in the law for 14 days. After the quarantine period had been accomplished they would be released to Home Confinement. Then during the initial 14 day quarantine period the DOJ sent down a new directive on Monday, April 20th, 2020, stating that inmates must have served 50 percent of their "sentenced" time prior to being released to Home Confinement. The DOJ took the ultra conservative route in their decision making and this was not 50 percent of the time they had to serve (because most inmates get 54 days good time credit for good behaviour for time served off of their sentence, thus 85 percent is what most men in the BOP serve of their original sentence). Plus most inmates will get a Home Confinement date that occurs six months prior to their release date along with months of Halfway House as well where they are still under BOP oversight. So when A.G. Bill Barr was asked about the DOJ decision he was not aware of what they had done.

Of course all of these things are just some of the reasons no doubt that the ACLU (American Civil Liberties Union) sued the BOP about ten days ago claiming the DOJ/BOP did not go far enough in the directive memo by A.G. Barr to release vulnerable prisoners to Home Confinement prior to the invasion of the Coronavirus entering the BOP (and this was even before the lastest debacle with the ultra conservative interpretation of the 50 percent must be from an inmates actual sentence). This of course will only acerbate the problem further and cause less prisoners to be released to HOme Confinement. The BOP Director Michael Carvajal claims it (BOP) has released approximately 886 prisoners to Home Confinement based upon A.G. William Barr's memo sent March 27th.

I would like to state that I am a black male, 39 years old, with asthma, and "nodules" on my lungs. All of which makes me very susceptible to the Covid-19 Pandemic virus. I have served approximately 65 percent of my time/incarceration. I have a Home Confinement Plan, where I will live with my fiance' in New York. I will be employed by my cousins carpet installation company immediately upon my release to Home Confinement. I havent had any disciplinary problems since 2014! I obtained my GED in 2016, and have taken numberous education programs such as Parenting, Personal Financial Planning, and Drug Abuse Education Program just to name a few. I will already have qualified for Half-Way House in August of 2021. I have tried to prepare myself to be a law abiding citizen of my community upon my release with your help. I DID NOT COME TO PRISON TO DIE!!!!

Judge, I greatly appreciate you atking the time to cnsider this humble request for immediate release to Home Confinement. I have a great sound plan to work once I am released, and to become a model citizen of my community.

Your most humble servant I remain,

*[signature: Robert Medina]*

Robert Medina
#68297-054
Federal Correctional Institution-Ashland
P.O. Box 6001
Ashland, KY   41105

> PLEASE NOTE THE FOLLOWING DISCLAIMER IS TO SHOW THAT IN EXTROARDINARY AND UNPRECEDENTED TIMES THE FOLLOWING WILL SUFFICE AS EVIDENCE AND PROOF THAT "administrative remedies guidelines is not absolute!"
>
> UNITED STATES VS. SAWICZ   08-cr-287 (ARR)(E.D.N.Y. April 10, 2020)
>
> The court waived the exhaustion requirement in its case. The court found that "Even where (administration) exhaustion is seemingly mandated by statute or decisional law, the requirement is not absolute," Washington v. Barr 925F .3d 109, 118 (2nd Cir. 2019)
>
> The Court went on to say that "A court may waive an administrative exhaustion requirement where (exhaustion) would be futile,........ where the administrative process woiuld be incapable of granting adequate relief......(or) where pursuing agency review would subject (the person seeking relief) to undue prejudice."
> Further, "(U)ndue delay, if it in fact results in catastrophic health consequences," can justify waiving an administrative exhaustion requirement for any of those three reasons ID. at 120-21.
>
> Here the court determined that the Covid-19 outbreak at FCI Danbury combined with Sawicz's risk of suffering severe complications because of his hypertension justified waive[r] defendant would experience if he had to wait before pursuing a motion for compassionate [release] would put him at significant risk of suffer[ing] consequences.
>
> The court also stated that the extroardinary warrants Sawicz's release here by the way of combined with Sawicz's particular vulnerabi[lity] from Covid-19 because of his hypertension.

SO ORDERED.

*Paul G. Gardephe* (signature)

Paul G. Gardephe
United States District Judge

June 20, 2020

The application for compassionate release is denied.  On July 25, 2014, following a jury trial, Medina was convicted of conspiracy to distribute and possess with intent to distribute marijuana, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(D), and of using, carrying, and brandishing a firearm in connection with a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(ii).  (Verdict (Dkt. No. 197); Judgment (Dkt. No. 251))  Medina's conviction arose from his involvement with a violent drug trafficking conspiracy in the Bronx.  (PSR ¶¶ 15-23)  At sentencing, the Court found by a preponderance of the evidence that the charged conspiracy involved the distribution of crack cocaine as well as marijuana.  (Sentencing Tr. (Dkt. No. 252) at 20-21, 25)  Medina was found responsible for distributing at least 20 grams of crack cocaine and approximately 238 grams of marijuana.  (Id. at 24-25)  Considered together with Medina's criminal history, that quantity of drugs yielded a Sentencing Guidelines range of 46 to 57 months' imprisonment.  Medina also faced a mandatory consecutive term of 84 months' imprisonment on the Section 924(c)(1)(A)(ii) charge.  The applicable Sentencing Guidelines range was thus 130 to 141 months' imprisonment.  (Id. at 26-27)  The Court concluded that a sentence at the top of the applicable range was called for, but credited Medina for eight months he had spent in state custody before his transfer into federal custody.  (Id. at 41-42)  Accordingly, Medina was sentenced to 133 months' imprisonment.  (Id. at 42; Judgment (Dkt. No. 251) at 3)  Medina appealed his conviction and sentence; the Second Circuit affirmed by summary order.  United States v. Medina, 642 F. App'x 59 (2d Cir. 2016).

Medina now applies for "[c]ompassionate [r]elease for [c]ompelling and [e]xtraordinary [c]ircumstances" pursuant to 18 U.S.C. § 3582(c)(1)(A).  (Apr. 27, 2020 Def. Ltr. (Dkt. No. 358))  In response, the Government contends that Medina  "has not shown that both extraordinary and compelling reasons and the Section 3553(a) factors warrant a reduction in his sentence.  In any case, Medina has also failed to exhaust his administrative remedies as required by Section 3582(c), and the Motion should also be denied on that ground."  (June 10, 2020 Govt. Ltr. (Dkt. No. 360) at 6)

Even if this Court were to reject the Government's exhaustion argument, Medina's application would fail on the merits.  Defendant is 39 years old, and although he asserts that he suffers from asthma and has possibly cancerous "nodules" on his lungs, he does not provide any additional detail or medical records in support of these allegations.  (See Apr. 27, 2020 Def. Ltr. (Dkt. No. 358) at 4; May 21, 2020 Def. Ltr.)  The two pages of medical records Medina has submitted to this Court suggest that he suffers from constipation.  Nothing in these records suggests that Medina suffers from asthma, has lung cancer, or is at a heightened risk of contracting COVID-19.  (See May 21, 2020 Def. Ltr.)  Moreover, when interviewed by the Probation Department in connection with the Presentence Report, Medina reported none of the medical conditions he alleges now.  (See PSR ¶¶ 85-88)  Defendant's alleged fear of contracting COVID-19 in prison – standing alone – is not an "extraordinary and compelling" reason justifying his release. See United States v. Simmons, No. 15 CR. 445 (PAE), 2020 WL 1847863, at *1 (S.D.N.Y. Apr. 13, 2020) (denying compassionate release where defendant "does not fit into any heightened risk category for COVID-19").

At sentencing, this Court noted that Medina presents a danger to the community.  (Sentencing Tr. (Dkt. No. 252) at 42)  There is no reason to revise that assessment.  Medina was involved in the distribution of crack cocaine and marijuana, and he routinely used, carried, and brandished firearms in connection with his drug dealing.  The defendant also engaged in acts of violence.  (See, e.g., PSR ¶¶ 23-24)

Accordingly, Medina's application for compassionate release is denied.  The Clerk of Court is directed to terminate the motion (Dkt. No. 358).  A copy of this memo endorsement will be mailed to Defendant by Chambers.

Robert Medina
Federal Register Number 68297 - 054
FEDERAL CORRECTIONAL INSTITUTION ASHLAND
Post Office Box 6001
Ashland, Kentucky 41105 - 6001

CERTIFIED MAIL

7018 0360 0002 1693 2642



USM P3 SDNY

RECEIVED
MAY -7 2020
PRO SE OFFICE

68297-054
Court Clerk
U.S. District Court
Southern District of New York
500 Pearl Street
NEW YORK, NY 10007
United States